**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-232 (CRC)** |
| **RICHARD MICHETTI,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Michetti ("Michetti") to 18 months' incarceration, the mid-range of the advisory guideline range in this case, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.     INTRODUCTION

The defendant, Richard Michetti, was an active participant in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

Richard Michetti, the defendant, went to the U.S. Capitol after the Stop the Steal rally,

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

and while there, texted a series of messages stating that he was inside the United States Capitol Building during the riot. He told W1, a former girlfriend, that he was at the riot because he believed the 2020 presidential election had been "rigged" and "stolen."  Notably, around 2:06 p.m., Michetti texted, "Gotta [sic] stop the vote it's fraud this is our country."

United States Capitol Police surveillance footage (CCTV) depicts Michetti entering the Upper West Terrace door of the Capitol at 2:35 p.m., within two minutes of the initial breach of that entrance by other rioters. Metropolitan Police Department (MPD) body worn camera (BWC) footage shows him among a mob or rioters in the Old Senate Chamber hallway from 2:44 to 2:46 p.m., trying to enter the Senate side of the Capitol.   He confronted officers while in the hallway, yelling "we pay you."   MPD officers used tear gas to push Michetti and other rioters out of that hallway.   Michetti then returned to the Rotunda, where he shouted at MPD officers "you are starting a civil war." He briefly left the Rotunda but returned to and tried to enter that room again. Only after police officers fired tear gas at him did he leave the building through the Rotunda East doors.

The government recommends that the Court sentence Michetti to 18 months' incarceration, the mid-point of the advisory Guidelines' range of 15-21 months. An 18-month sentence reflects the gravity of Michetti's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Michetti among them, unlawfully broke into the U.S. Capitol Building to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured police officers, sometimes with dangerous

weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Michetti's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the

rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol

5

Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.     Michetti's Role in the January 6, 2021, Attack on the Capitol

Michetti actively participated in the January 6 attack on the Capitol by, among other actions, entering and remaining in the Capitol for 45 minutes and taunting and yelling obscenities at law enforcement, referring to them as "fucking animals."   His crimes are documented through a series of videos he sent to a former girlfriend, body worn camera videos, open-source video, and surveillance camera footage from inside of the Capitol.

Michetti traveled to Washington, D.C. on January 5, 2021, from his home in Ridley Park, Pennsylvania. The next day, on January 6, 2021, he attended the "Stop the Steal" rally and thereafter marched to the U.S. Capitol. As discussed below, his social media and texts reflected his belief that the election for President in 2020 was wrought with fraud. He texted W1 at approximately 2:06 p.m. on January 6, 2021, stating "…it's going down here we stormed the building they held us back with spray and teargas and paintballs."   At approximately 2:09 p.m., Michetti texted W1, "Gotta stop the vote it's fraud this is our country."

Michetti entered the Capitol building through the Upper West Terrace door – a non-public entryway that was alarmed with a shrill siren.   CCTV captured him as he entered at approximately 2:35 p.m., merely two (2) minutes after that door was initially breached by rioters:





Michetti then proceed up the staircase to the Rotunda as seen on CCTV around 2:50 p.m.:



By approximately 2:43 p.m., Michetti was in the Rotunda. At approximately 2:44 p.m., Michetti sent videos (screen shots below) to W1 from his telephone, showing rioters inside the U.S. Capitol Building in the Rotunda, and in the Old Senate Rotunda, leading to the hallway of the Old Senate Chamber:





A photograph taken by another January 6 rioter provides a clearer view of the tear gas deployed by police in the old Senate Rotunda, where Michetti was at that time.



By 2:44 p.m., Michetti was part of a mob trying force its way past a line of Metropolitan Police Department Officers in the hallway by the Old Senate Chamber. He was captured in a video by a French news company (Bangumi) as he pushed his way forward:





The photograph below from a video on Michetti's phone from Instagram TV handle "theredelephants"[2] also captures the scene (on the left), as did Michetti's social media post (on the right):

---

[2] "The Red Elephants was an American right wing political channel that was dedicated to encouraging more people

10



Michetti was at the front of the crowd, yelling at the police as shown on BWC "we feed your family"; "you are just taking orders"; and "who do you work for – you get paid by us!" (Gov't Exhibit 1):

---

to become conservative, especially young people, as well as political opinions, commentary, and debates." https://youtube.fandom.com/wiki/The_Red_Elephants, visited August 14, 2022.



He supported actual assaults by others in the mob perpetrated upon police. Michetti yelled and gesticulated at the MPD officers calling them "fucking animals" (time stamp 14:46:32): (See Gov't Exhibit 2, and screen shot below):



At one point, Michetti briefly pinched the sleeve of one officer (circled in green on the BWC screen shot below) as the officers were trying to do their lawful duty and keep the mob from penetrating further into the building (Gov't Exhibit 3 at time stamp 14:43:47):



By 2:49 p.m., BWC showed that Michetti made it into a stairwell off the Senate hallway by the Old Senate Chamber but was herded out by the police:



The MPD was successful in preventing the rioters from entering the present Senate Chamber. They used OC spray or another chemical irritant to disperse the crowd in the Old Senate Chamber hallway back to the Rotunda, as shown in this still shot of a video taken by another January 6 defendant:



The same defendant captured Michetti in another video, leaving the hallway after police deployed the spray:



As shown in CCTV footage, Michetti walked around the Rotunda from at least 2:52 p.m.

until about 3:00 p.m.





During this time, he yelled at the MDP officers standing in the Rotunda, "You know you caused a civil war. You know that right?" (Gov't Exhibit 4):




CCTV footage (top two photos below) and an online video "Capitol Hill Occupy" (lower photo below) also show that Michetti then left the Rotunda and went into the lobby inside East Rotunda doors:







As he moved towards the doors to leave, a mob of rioters who were entering the Capitol through the same East Rotunda doors pushed Michetti:



As Michetti then turned toward the interior of the Capitol, CCTV footage (screen shots from that video shown below) shows that Michetti faced a U.S. Capitol Police bicycle officer (Michetti is

circled in red), and yelled and gesticulated toward him (Gov't Exhibit 5 timestamp :03 to :18

seconds):





Michetti then walked back toward the inner door to the Rotunda at about 3:12 p.m., again pushing with the mob against a police line there:



He then came back into the Rotunda lobby, stumbling and rubbing his eyes, as seen in the screen shot below from the video taken by another rioter:



Michetti left the building through the East Rotunda doors at approximately 3:15 to 3:20 p.m.:



At approximately 4:26 p.m., Michetti texted W1, "If you can't see the election was stolen, you're a moron," and "This is our country do you think we live like kings because no one sacrificed anything?"   Michetti continued texting, saying ". . .[T]he vote was fraud and trump won but they won't audit the votes. We are patriots we are not revolutionaries the other side is revolutionaries they want to destroy this country and they say it openly. When the left banged on the doors of congress when they congratulated for Brett Kavanaugh [sic] no one got touched not one of them. We were outside and they were shooting tear gas and pepper spray."

To another friend, Michetti texted (in light grey):

> They have done a bunch.  Nothing happened.  Get over it

Woah do we remember this? Look at the cops there. The cops were the aggressors for no reason today I was there they just started firing tear gas and flash bangs and we weren't even at the building

A bunch? What did they do they didn't do any audits Lolol

Michetti can be seen in this open-source screen shot on the East steps using his phone after leaving the Capitol:



About the same time, Michetti posted the statement, "This is trump country they sold this election" on Instagram TV.



Michetti left the Capitol grounds at approximately 5:26 p.m.



At around 6:04 p.m., he sent a series of text messages to W1, which read: "I understand your point but what I'm saying is [W1's name] the election was rigged and everyone knows it. All's we wanted was an investigation that's it. And they couldn't investigate the biggest presidential race in history with mail in ballots who everyone knows is easy to fraud."   He also

23

texted, "This is tyranny they say there and told us 'we rigged the election and there's nuthin you can do about it' what do you think should be done?"

Michetti's FBI Interview

Pursuant to the terms of his plea agreement, Michetti engaged in an interview with the U.S. Attorney's Office and FBI prior to his sentencing. During his interview, Michetti expressed some remorse. He stated he went to D.C. because he believed the presidential election of 2020 was fraudulent. When he heard the former President advocating a march down to the Capitol to protest the fraudulent vote, Michetti followed. Michetti said that at the outside of the Capitol, he saw paint balls and tear gas being deployed into the crowd, and he saw officers trying to fight off rioters on the Northwest stairs.   Afterward, he went up those stairs to the Upper West Terrace, then came down again.

Michetti then returned to the Upper West Terrace with a large crowd of approximately 300 people and entered the Capitol building. He admitted to being in the crowd of rioters in the hallway by the Old Senate Chamber and admitted yelling at the police officers holding the line there.   He also admitted to yelling to the Metropolitan Police officers in the Rotunda that they were starting a "civil war."   Michetti said that after he left the Rotunda, he tried to leave the building but was pushed back inside. He stated that when he went to the inner Rotunda doors, he experienced tear gas in his eyes. He then left the building and went outside where he remained on the restricted property until dark.

Michetti continued to express his confusion that he was not supposed to be in the Capitol when he was told to protest there by the former President. He expressed his belief that he had

been "played for a fool" by the former President and that he would not have gone to the Capitol after the speeches if the former President had not said to go there to protest.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 19, 2021, a federal grand jury returned an indictment charging Michetti with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On May 31, 2022, Michetti pled guilty to Count One, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2).

## IV.    STATUTORY PENALTIES

Michetti now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, Michetti faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Obstruction of an Official Proceeding.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In the draft presentence report, ECF 45, the Probation Office has calculated the applicable Guidelines Offense Level identically to the parties' stipulated calculation in the guilty plea agreement, ECF 42. *Compare* ECF 45, ¶¶ 30-39, 42 with ECF 42, ¶ 5A. That Guidelines analysis is:

<u>Count One: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[3] | +3 |
| | **Total** | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

*See* PSR at ¶¶ 30-39; ECF 42, Plea Agreement at ¶ 5(A-C).

The U.S. Probation Office calculated Michetti's criminal history as category I, which is not disputed. PSR ¶ 42. However, he is facing pending charges of contempt of court for allegedly violating a protective order, and for possessing firearms in violation of that protective order. He

---

[3] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Michetti admitted in his Statement of the Offense (ECF 41, SOO at ¶ 17) that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.7 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

also was charged in 2009 with possession of marijuana. According to the PSR, the resolution of that charge is unknown.   PSR at ¶¶ 45-47.

The resulting advisory Sentencing Guidelines range is 15 to 21 months incarceration.[4]

**SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

Sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a term of incarceration.

**A.      Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the

---

[4] Paragraph 91 of the PSR erroneously states that Michetti would have been subject to an enhancement for possession of a dangerous weapon had he been convicted of Count 2. That is incorrect. The investigation has produced no evidence that Michetti possessed a dangerous weapon on January 6.

Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Michetti's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Michetti personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Michetti's part is therefore not a mitigating factor in misdemeanor cases.

The nature and circumstances of this defendant's crimes support the government's sentencing recommendation in this case. Michetti entered the building within two minutes of the initial breach of the West Front door so he would have seen the crowd surging toward the Upper West Terrace door to break it down and enter.  He later posted on social media that "…we breached the building."

While inside, Michetti repeatedly accosted and confronted police officers in the hallway by the Old Senate Chamber. He yelled at the MPD officers and appeared to grab the sleeve of one officer.   He defied the police line and made it into a stairwell which would have taken him further inside the Capitol.   He left that stairwell only after police directed a chemical irritant against him.

Even after that, he paraded through the Rotunda, yelling to the MPD officers that they were starting a "civil war."     He confronted a Capitol police officer near the East Rotunda doors, yelling and gesticulating toward him. He went back toward the Rotunda as part of a surging mob and tried again to get inside.   And again, it took an irritant being directed toward him for him to finally leave the building. Michetti remained defiant, texting to W1 that "They were shootin and throwin [sic] tear gas before we even were near the building. It's public property," and "All's we wanted was an investigation that's it. And they couldn't investigate the biggest presidential race in history with mail in ballots who everyone knows is easy to fraud."

Michetti's actions on January 6 showed an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. His actions showed a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed police.

**Michetti's History and Characteristics**

Michetti is a construction worker, who has had the same employer since 2014. PSR ¶ 77. Michetti has no convictions, other than 3 traffic violations, and has a criminal history of I. PSR at ¶¶ 42-43. He has not complied with the Selective Service law requiring males to register upon reaching their 26th birthday. Id. at ¶ 75. While Michetti has maintained employment, and avoided

having a criminal history until now, his rhetoric and actions on January 6, 2021, weigh heavily in

favor of a term of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Michetti's criminal conduct confronting police and in corruptly obstructing of an official proceeding shows blatant disrespect for the law. Police officers were overwhelmed, outnumbered, and often in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence has two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As Judge Kollar-Kotelly succinctly stated "Indeed, even the presence of *one* unauthorized person in the Capitol is reason to suspend Congressional proceedings." *United States v. Jesus D. Rivera*, 1:21-cr-00060 (CKK), Doc.62, Findings of Fact and Conclusions of Law, at 13. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a term of incarceration. He believed that certification of the 2020 presidential election was creating a "civil war" and engaged with hundreds of others to jointly try and stop Congress from doing its Constitutional duty. He personally confronted police and encouraged other rioters who were assaulting officers in the Old Senate Chamber hallway. Michetti was sprayed twice with irritant and twice remained in the Capitol building despite the clear efforts of police to force him and other riots to leave. Although Michetti has a criminal history category of I, his actions on January 6 were those of a man ready to do battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (Statement of Judge Chutkan). Michetti's own statements that he believed police was causing a "civil war" demonstrates that this defendant's sentence must be sufficient to provide specific deterrence from committing future, possible violent crimes.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Michetti and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other defendants convicted for violating 18 U.S.C. § 1512 (a)(2) for conduct that occurred before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Other cases in which the defendant pleaded guilty to violating Section 1512(c)(2) on January 6 are inappropriate comparators under Section 3553(a)(6). For instance, in *United States v. Paul Hodgkins*, 21-cr-188-RDM, the defendant was the first January 6 defendant sentenced, on July 19, 2021, for a violation of §1512(c)(2). Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag. In that case, the government recommended a prison sentence of 18 months, the middle of the Guidelines range of 15-21 months. Judge Moss sentenced

Hodgkins to 8 months' imprisonment. Unlike Michetti, Hodgkins took very early responsibility for his actions and he did not incite violence against the police on January 6.   By contrast, defendants like Jacob Chansley, 21-cr-3-RCL, who received a within-Guidelines 41-month sentence, and Matthew Miller, 21-cr-75-RDM, who received a below-Guidelines 33-month sentence, both threatened or engaged in violence, which Michetti did not.   A sentence within the 15–21 month Guidelines range would appropriately situate Michetti considering these other dissimilar defendants.

**RESTITUTION**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Michetti must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Michetti played in the riot on January 6.[8] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Michetti's restitution payment will be sent to the Architect of the Capitol. *See* PSR ¶ 26.

## VI.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 18 months, which is the mid-range sentence as calculated by the United States Probation Office and as agreed upon by the parties in the plea agreement,

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

followed by three (3) years of supervised release, restitution of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Mona Lee M. Furst*
MONA LEE M. FURST
KS Bar No. 13162
Assistant United States Attorney
Capitol Siege Section - Detailee
U.S. Attorney's Office
601 D. Street, N.W.
Washington, D.C. 20579
Office: 316-269-6537
Mona.Furst@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 25th day of August 2022, a copy of the foregoing was served on counsel

of record for the defendant via the Court's Electronic Filing System.

BY:    */s/ Mona Lee M. Furst*
       MONA LEE M. FURST
       KS Bar No. 13162
       Assistant United States Attorney
       Capitol Siege Section - Detailee
       U.S. Attorney's Office
       601 D. Street, N.W.
       Washington, D.C. 20579
       Office: 316-269-6537
       Mona.Furst@usdoj.gov